AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

FILED
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

FEB 2 5 2026

MITCHELL R. ELFERS
CLERK OF COURT

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| IN THE MATTER OF THE SEARCH OF A BLACK APPLE IPHONE LOCATED AT THE LAS CRUCES HSI OFFICE | ) |

Case No. 26 MR 400

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

a black iPhone, more fully described in Attachment A, which is attached and incorporated herein.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2314 | Transportation of Stolen Goods |
| 18 U.S.C. 371 | Conspiracy |

The application is based on these facts:
See Affidavit in Attachment C, attached and incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Tara M. Tripp, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ electronic submission and telephonic swearing _____ *(specify reliable electronic means)*.

Date:  2/25/26

_____
*Judge's signature*

City and state:  Las Cruces, New Mexico

Gregory J. Fouratt, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

The property to be searched is a Black Apple iPhone, hereinafter the "Device." The Device is currently located at the Homeland Security Investigations, Las Cruces Office, located at 200 E. Griggs Ave, Las Cruces, NM.

 

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B, and to compel the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) of the Device Owner in order to unlock the Device and/or grant full access to the applications and information stored on the Device.

**ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to violations of 18 U.S.C. § 659 (Theft from Interstate Shipments), 18 U.S.C. § 2314 (Interstate Transportation of Stolen Property), and/or 18 U.S.C. § 2 (Aiding and Abetting the Foregoing Criminal Activity) 18 U.S.C. § 1956 (Laundering of Monetary Instruments),  (collectively, the "Subject Offenses"), and involve Obed Lopez ("Lopez" or the "Device Owner), Thomas Rees ("Rees"), Christopher Ortega ("Ortega"), Maxwell Jensen ("Jensen"), Carlos Arturo Contreras Fernandez, ("Carlos Contreras"), Christian Jesus Contreras Varela ("Christian Contreras"), German Ortiz Santillano ("Ortiz"), and other co-conspirators and criminal actors, since April 1, 2025, including:

   a.  All records pertaining to the theft of oil, interstate transportation of stolen oil, and/or sale of stolen oil;

   b.  All records pertaining to the transfer of proceeds from stolen oil from one individual to another;

   c.  All records pertaining to the creation, transmission, and/or payment of tickets documenting the receipt and/or sale of oil;

   d.  All records identifying or otherwise pertaining to any co-conspirators or individuals who aided and abetted in the commission of the Subject Offenses;

   e.  Quantities of oil stolen and the dates and locations of each theft;

   f.  Amount and value of tickets created, transmitted, and/or paid, and the dates and locations of each such incident;

   g.  Location information pertaining to where the oil was stolen from, where the stolen oil was transported to, and route taken during that transportation;

h. Any records or information pertaining to the manner in which any payment for stolen oil was transmitted;

i. Any records of financial transactions indicative of money laundering and/or attempts to conceal the origin of funds;

j. Any records or communications regarding the transfer of bulk currency;

k. Any information recording the schedule or travel of Lopez, Rees, Ortega, Jensen, Carlos Contreras, Christian Contreras, Ortiz, and/or other co-conspirators and criminal actors at any time relevant to the commission of the Subject Offenses;

l. All bank records, checks, credit card bills, account information, and other financial records, including payment records, records of receipts of payments, digital ledgers and records, ledgers and records, photographs of written ledgers and records, receipts and invoices in any form, photographs of receipts and invoices, apps used to transmit money from one individual to another, bank account information pertaining to proceeds obtained from the Subject Offenses, and any information about the current location of any money obtained form the Subject Offenses;

m. Any and all records pertaining to the knowledge of, state of mind pertaining to, and/or intent to commit the Subject Offenses;

n. Any and all digital media pertaining to the Subject Offenses, including photographs, videos, and audio recordings;

o. Any and all other evidence of violations of the Subject Offenses and/or pertaining to any proceeds obtained from the Subject Offenses.

3

p.  Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

2.      Law enforcement personnel are also specifically authorized to obtain from the Device Owner the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any of the Device and/or grant full access to the applications and information stored on any of the Device that require such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, for the purpose of attempting to unlock the Device's security features in order to search the contents as authorized by this warrant.

3.      While attempting to unlock any of the Device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the Device Owner speak, state, write, or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device. Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the Device Owner to state, speak, write, or otherwise provide that information. However, the voluntary disclosure of such information by the Device Owner is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to the Device, or to identify which biometric

4

characteristic (including the unique finger(s) or other physical features) unlocks the Device, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

4.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

5.      This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the HSI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF
A BLACK APPLE IPHONE LOCATED AT
THE LAS CRUCES HOMELAND
SECURITY INVESTIGATIONS OFFICE

Case No. _____

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Tara Tripp, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of

Criminal Procedure for a search warrant authorizing the examination of property— an electronic device—

which is currently in law enforcement possession, and the extraction from that property of electronically

stored information described in Attachment B.

2.      I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have

been since September 2024. I am classified, trained, and employed as a federal law enforcement officer

with statutory arrest authority and charged with conducting criminal investigations of alleged violations

of federal criminal statutes, including Title 8, Title 18, and Title 21 of the United States Code. I am

currently assigned to the Homeland Security Task Force in Las Cruces, New Mexico. Previously, I

served as a criminal investigative analyst for the Georgia Attorney General's Office for three years,

which included dozens of investigations into computer facilitated fraud, identity theft, and other white-

collar crimes.

3.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended to show

6

merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless otherwise indicated, where I have referred to written or oral statements, I have summarized them in substance and in part, rather than verbatim. Not all facts of the investigation known to me are contained herein, only those necessary to establish probable cause to search the below-listed items pertaining to the captioned investigation.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is a Black Apple iPhone, hereinafter, the "Device." The Device is currently located at the Homeland Security Investigations, Las Cruces office in Las Cruces, New Mexico.

5.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.      On June 18th, 2025, an FBI SA of the Midland, Texas Resident Agency Office was notified by a confidential source of information (CS) that Maxwell Jensen was seeking to orchestrate a scheme in which he would pay off employees of oil production companies for crude oil. The CS explained to FBI that Jensen would be storing the stolen crude oil at 4154 7 Rivers Highway, Carlsbad, New Mexico (Target Location), and that Jensen was seeking a vacuum truck driver to pick up oil from third party locations, and the Target Location was used to receive approximately 600 barrels of oil every day. At current crude oil prices 600 barrels is valued at $39,000.

7.      Federal SAs conducted periodic surveillance of the Target Location. The location had three 500-barrel frac tanks and a white water hauling vacuum truck (Target Vehicle) that

7

was frequently parked there. In my experience, I know that crude oil thieves utilize frac tanks to store stolen crude oil and vacuum trucks to steal millions of dollars' worth of crude oil from a variety of locations, including oil pipelines. The Target Vehicle's US DOT number is 3183291, and it bears the company name M.I.S. LLC in red lettering on its side.

8. On July 22, 2025, a Bureau of Land Management (BLM) SA observed the Target Vehicle leaving the location. The BLM SA followed from a distance as it entered the oilfield and observed the Target Vehicle drive up to a Plains All American Pipeline site, located at coordinates 32.62494, -104.10080, a site in New Mexico, and hook up to a portion of the pipeline at the site. The BLM SA left the area and returned later to photograph the scene. While the BLM SA was leaving the area after taking photos, the SA observed that the Target Vehicle had already traveled to another Plains All American Pipeline site, located at coordinates 32.65158, -104.10264, another site in New Mexico, on the same pipeline. A Plains All American company truck was there assisting the Target Vehicle driver, suggesting that a Plains All American employee may be complicit in the scheme to steal the crude oil out of the pipeline.

9. On July 29, 2025, BLM submitted a tracker warrant for the Target Vehicle suspected of stealing and transporting stolen crude oil, and a federal magistrate judge signed the court order the following day.

10. On July 30, 2025, BLM coordinated a multi-agency operation and observed the suspects stealing crude oil. During the operation, Agents obtained video of the Target Vehicle as it connected to the pipeline and traveled back to the Target Location. Agents observed a white GMC truck bearing New Mexico license plate RXP352 meet the Target Vehicle at the Target Location. Agents confirmed the white GMC truck was last registered to a "Christian Jesus Contreras Varela," (Christian Contreras), address 403 N 8th St., Loving, New Mexico 88256.

8

11.     A review of the tracker data revealed that the Target Vehicle made 15 trips to Plains All American Pipeline sites from July 31, 2025, to August 11, 2025. On August 11, 2025, the tracker appeared to fall off the Target Vehicle. The tracker was located and placed back on the Target Vehicle on August 14, 2025.

12.     On August 13, 2025, a BLM SA went to one of the locations where the vacuum truck made multiple trips to Plains All American Pipeline sites to place a game camera to identify the Plains All American Truck working with the suspects.

13.     The tracker data revealed that from August 15, 2025, to August 18, 2025, the Target Vehicle made four trips to Plains All American Pipeline sites. A total of 23 trips were recorded on the tracking device going to the Plains All American pipeline sites from July 22, 2025, to August 18, 2025.

14.     On August 26, 2025, the same BLM SA observed a Plains All American truck parked at a gas station on North Canal Street in Carlsbad, NM. This was the same Plains All American truck that had been present at all the observed thefts. Using a picture previously obtained during a surveillance, BLM was able to identify the truck as the same white Chevy 2500 truck by the last four digits of the Texas license plate 8680. The truck was the same make, model, and color. It also had a red Zia symbol located on the top right side of the back window. The black toolbox in the bed of the truck was identical, and the fire extinguisher in the bed was in the same location.

15.     BLM followed the truck north from the gas station on North Canal Street out of Carlsbad, NM. The truck then turned onto Illinois Camp Road and continued north into the area where all the crude oil thefts had occurred. BLM noticed that the trailer the truck was pulling did not have a license plate. BLM contacted an Eddy County Sheriff's Office detective sergeant, and a traffic stop was conducted. After the detective finished issuing a written warning to the driver, identified as German

9

Ortiz-Santillano ("Ortiz-Santillano"), BLM approached him. BLM asked Ortiz-Santillano if he would be willing to step out and speak, and he agreed.

16.     Ortiz-Santillano told the BLM SA that he had been working for Plains All America for about two years. Ortiz-Santillano stated his job was "pigging" and to change the valves and install installation kits. The pigging stations were the locations where the thefts had occurred. Ortiz-Santillano told BLM that he was the only one who drove the company truck in which he had been stopped and that he took the truck home each night.

17.     On August 26, 2025, BLM arrested Ortiz-Santillano for violations of 18 U.S.C. 2314, Transportation of Stolen Goods, and seized the cell phone in his possession.

18.     On November 11, 2025, Ortiz-Santillano provided written consent to search his previously seized cell phones. On or about November 24, 2025, HSI obtained a copy of the cell phone extractions and began reviewing the contents. Two of Ortiz-Santillano's most frequently contacted numbers were 915-304-8614, saved as "Samuel Cardona," and 915-309-1451, saved as "Obed Lopez Plains."

19.     On December 3, 2025, a German Ortiz[1] made the following statements:

   a.   Obed Lopez organized the oil theft and used at least Ortiz and another Plains All American employee;

   b.   Lopez communicated locations for oil theft via WhatsApp text messages; and

   c.   Lopez paid him in cash for the trips made to steal oil.

20.     On December 3, 2025, HSI obtained a copy of a WhatsApp conversation between Ortiz, Samuel Cardona, and Obed Lopez—each one a Plains All American employee. The WhatsApp communications primarily coordinated trips to receivers, tanks, or "LACTs." In one instance on April 23,

---

[1] German Ortiz is cooperating with the hopes of receiving consideration for his cooperation at sentencing, as well as hopes to prevent adverse consequences to his lawful permanent resident status.    10

2025, and extending into the early morning hours of April 24, 2025, Lopez asked the WhatsApp group if the truck was "hidden" and Cardona replied that two were done.

21.    On February 18, 2026, a Grand Jury returned an indictment against Obed Lopez for violations of 18 U.S.C. 371, Conspiracy, and 18 U.S.C. 2314, Interstate Transportation of Stolen Goods.

22.    On February 24, 2026, at approximately 0700, the BLM, HSI, FBI, and local law enforcement executed the arrest warrant against Obed Lopez, and took him into custody at 1010 North Ave, Carlsbad, NM. Lopez had one cell phone in his possession, and HSI seized the device as evidence pursuant to his arrest.

23.    The Device is currently in the lawful possession of the HSI in Las Cruces, New Mexico. The Device is currently in storage at the HSI Las Cruces Office, located at 200 E. Griggs Ave, Las Cruces, NM. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into possession of HSI.

24.    Based on the foregoing, I believe probable cause exists that Obed Lopez violated 18 U.S.C. § 2314, and the evidence may be found on the Device seized from Lopez at the time of his arrest on or about February 24, 2026.

## TECHNICAL TERMS

25.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: a digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard

12

drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

13

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and

14

presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26.     Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and to access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

16

information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

31. *Biometric information.* The warrant I am applying for would also permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock the Device and/or grant full access to the applications and information stored on the Device that are subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, offer their users the ability to unlock the device and/or grant full access to the applications and information

17

stored on the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device and/or grant full access to the applications and information stored on the devices through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device and/or grant full access to the applications and information stored on the device. Once a fingerprint is registered, a user can unlock the device and/or grant full access to the applications and information stored on the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device and/or grant full access to the applications and information stored on the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked and/or full access to the applications and information stored

18

on the device can be granted if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device and/or grant full access to the applications and information stored on the Device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

32.    Due to the foregoing, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of the Device Owner to the fingerprint scanner of the Device; and to (2) hold the Device in front of the face of the Device Owner and activate the facial recognition feature, for the purpose of attempting to unlock the Device and/or grant full access to the applications and information stored on the Device, in order to search the contents thereof as authorized by this warrant.

**CONCLUSION**

33.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B. The requested warrant would also permit law enforcement to obtain the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) of the

19

Device Owner in order to unlock the Device and/or grant full access to the applications and information stored on the Device.

Respectfully submitted,

Tara M. Tripp
Special Agent
Homeland Security Investigations

VIA PHONE

Subscribed and sworn to before me on ___2/25___, 2026

Honorable Gregory J. Fouratt
United States Magistrate Judge